# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS

Reissued for Public Availability Date: May 7, 2026

```
* * * * * * * * * * * * * * * * * * * *
ANNE PISANI, as legal              *
representative of ESTATE           *      No. 20-1249V
OF FRANK PISANI,                   *
                                   *
           Petitioner,             *
                                   *      Special Master Christian J. Moran
v.                                 *
                                   *      Filed: November 14, 2025
SECRETARY OF HEALTH                *
AND HUMAN SERVICES,                *
                                   *
           Respondent.             *
* * * * * * * * * * * * * * * * * * * *
```

Anne Carrion Toale, Maglio Christopher and Toale, Sarasota, FL, for petitioner;
Dorian Hurley, U.S. Dep't of Justice, Washington, DC, for respondent.

## PUBLISHED DECISION AWARDING ATTORNEYS' FEES AND COSTS[1]

Pending before the Court is petitioner Anne Pisani's motion for final attorneys' fees and costs. She is awarded **$145,239.29**.

## I.    Procedural History

Events in Ms. Pisani's case can be divided into two phases: the entitlement phase and the fees phase. Sources of information include various pleadings on the

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). This means the Decision will be available to anyone with access to the internet. In accordance with Vaccine Rule 18(b), the parties have 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. Any changes will appear in the document posted on the website.

docket; the attorneys' timesheets, which are included with the pending fee motion; and information communicated through a recorded status conference, which was held on February 13, 2025,[2] and a supplemental affidavit from Ms. Toale, in which Ms. Toale corrected some misstatements. This supplemental affidavit is Exhibit 54.

## A.    Entitlement Phase

Represented by attorneys from the law firm Maglio Christopher and Toale (also referred to as "mctlaw"), Ms. Pisani alleged that an influenza vaccine administered to her husband, Frank Pisani, on October 10, 2018, caused him to suffer from Guillain-Barré syndrome ("GBS"). Pet., filed Sept. 23, 2020. The petition is approximately 11 pages and sets out in numbered paragraphs Mr. Pisani's medical history. Some of the numbered paragraphs extensively quote some of the medical records.

The Secretary maintained that Ms. Pisani was not entitled to compensation for several reasons. Resp't's Rep., filed June 30, 2021. Over the course of approximately 10 pages, the Secretary summarized Mr. Pisani's medical records. Id. at 2-10. Among the reasons supporting the denial of compensation according to the Secretary was that "[a]lthough Mr. Pisani's treating physicians thought he may have had GBS, he was ultimately diagnosed with vasculitis, Sjogren's syndrome, and other conditions, but not GBS." Id. at 12.

Because Ms. Pisani was likely to obtain a report from an expert, a set of Expert Instructions was issued. Order, issued Oct. 6, 2021. The Instructions provided guidance about how experts should create invoices. The Instructions were issued in draft form to allow the parties an opportunity to comment. Neither party suggested any changes nor posed any objections to the Instructions in the time permitted. The deadline for a report from an expert was set at January 21, 2022. Order, issued Nov. 23, 2021.

On December 14, 2021, Attorney Anne Toale replaced her predecessor as counsel of record for Ms. Pisani. Ms. Toale has continued to represent Ms. Pisani since that time. Ms. Toale conferred with an expert on December 28, 2021. Timesheets (filed as Exhibit 47). This expert was Kazim Sheikh. Exhibit 48 at 40 (invoice); Tr. 6.

*Dr. Sheikh, neurologist*

---

[2] Citations to "Tr." refer to this status conference.

Dr. Sheikh is a neurologist, who has sometimes assisted petitioners in the Vaccine Program.  See Exhibit 53 (Dr. Sheikh's curriculum vitae).  Ms. Toale characterized Dr. Sheikh as "a world renowned GBS expert."  Tr. 15.  On questions of diagnosis, Dr. Sheikh is "a purist."  Id.; accord Tr. 19.  Ms. Toale provided Dr. Sheikh with the petition, the Secretary's report, Mr. Pisani's EMG, the results of biopsies, the results of blood tests.  Exhibit 48 at 40 (Dr. Sheikh's invoice).

Dr. Sheikh declined to offer a report supporting Ms. Pisani's claims. According to Ms. Toale, Dr. Sheikh "thought there were features of the EMG that didn't support GBS."  Tr. 19.[3]  Ms. Toale also stated: "there can be a lot of reasons that an expert doesn't pick up a file and run with it."  Tr. 19.  However, the only specific reason Ms. Toale offered as to why Dr. Sheikh declined to write a report was the problems with the EMG.

On behalf of Ms. Pisani, Attorney Toale submitted a short motion for an enlargement of time to extend the deadline for filing an expert report.  Pet'r's Mot., filed Jan. 21, 2021.  Ms. Toale stated: "Undersigned counsel is new to the case and is reviewing potential experts to engage."  Both assertions are accurate---Ms. Toale was new to the case and was reviewing potential experts to engage.  Ms. Toale did not disclose that one expert reviewed the case and did not prepare a report.

### *Search for a Rheumatologist and a Second Neurologist*

Ms. Toale sought the assistance of a company that refers experts, Guidepoint Global.  See Timesheets (entries for Jan. 26, 2022 and Feb. 24, 2022); see also Pet'r's Memorandum, filed June 18, 2024, at 1-2.  Guidepoint Global charged $2,500.00.  Exhibit 48 at 44.  Eventually, Ms. Toale retained a rheumatologist, Ariel Teitel.  See Exhibit 24 (Dr. Teitel's report, dated Aug. 30, 2022).

Dr. Teitel's retention was in early March 2022.  Timesheets (entry for Mar. 7, 2022); see also Pet'r's Mot., filed May 23, 2022, ¶ 6.  Ms. Toale stated that for some experts, especially new experts, she explains to the experts what charges are allowed.  Tr. 8, 12.  For example, according to Ms. Toale, she has received invoices from experts that were too low because the expert did not include all activities that may be billed, such as emailing and reviewing the report of the

---

[3] Ms. Toale's answer continues: "he didn't know any medical facts about the guy."  Tr. 19.  However, Dr. Sheikh was aware of the basic medical chronology for Mr. Pisani by reading the summaries of the medical records in the petition and the Secretary's report.  Ms. Toale may be correct in saying that Dr. Sheikh did not review any medical records directly.  However, Dr. Sheikh did have access to some medical information about Mr. Pisani.

Secretary's expert.  Tr. 12-13.  Whether Ms. Toale provided this guidance about billing to Dr. Teitel is unknown.

After Dr. Teitel's retention, Ms. Toale and Dr. Teitel frequently communicated about the deadline for filing the report, which was, at that time, May 23, 2022.  Via Ms. Toale, Ms. Pisani sought an enlargement of the deadline to July 22, 2022.  The motion asserted that the expert had started work but needed more time, in part, because the expert was new to the Vaccine Program:

> [the expert] has only completed a partial records review and literature search at this point.[4] The expert anticipates completing his review of the case materials in the next 2-3 weeks, at which point he can begin drafting a report. Once drafted, it is likely that significant additional work will need to be done with the expert and the draft report, given that this is a first-time expert.

Pet'r's Mot., filed May 23, 2022.[5]  In a status conference to discuss the pending motion for an enlargement of time, Ms. Toale stated that Ms. Pisani was not pursuing a claim based upon Guillain-Barré syndrome.  She requested 90 days to obtain a report from her expert.  She was given this much time, although the order also noted that if Ms. Pisani did not meet the deadline, an order to show cause would issue.  Order, issued June 1, 2022 (setting expert report deadline for August 30, 2022).

Following the June 1, 2022 order, Ms. Toale continued her efforts with Dr. Teitel.  She also returned to the question of Guillain-Barré syndrome.

### *Dr. Jeret, second neurologist*

With respect to a potential claim regarding Guillain-Barré syndrome, Ms. Toale did not recall in the February 13, 2025 status conference that in the June 1, 2022 status conference, she had said she was not pursing a claim based upon Guillain-Barré syndrome.  Tr. 18, 21.  Regardless, Ms. Toale stated, "maybe I had

---

[4] According to Dr. Teitel's invoice, as of the date of this motion, he had not spent any time reviewing the medical records and he had not spent any time reviewing the medical literature.  As of the date of the motion, it appears that Dr. Teitel's total time on the case was limited to less than approximately 30 minutes of emails.  Dr. Teitel first reviewed literature on May 27-28, 2023, and first reviewed the medical records on July 8, 2023.  Exhibit 48 at 63.

[5] This motion also disclosed that a neurologist had completed his review in January 2022.

a change of heart or talked with one of my partners or something." Tr. 21; accord time entry for July 29, 2022 (a different attorney: "consult with lead counsel on litigation strategy, expert consultation"). In her experience, a second opinion can assist a petitioner. Tr. 21-23.

Ms. Toale's July 30, 2022 time entry is confusing. It states: "Review records summary to analyze draft neurology expert report; review report." When asked about this entry during the February 13, 2025 status conference, Ms. Toale explained that the "records summary" is a summary of medical records that her office prepared. The semicolon indicates that she next reviewed a different report, i.e., a report that Dr. Jeret prepared. Tr. 14.

However, other information appears inconsistent with this explanation. Dr. Jeret's first entry on his invoice reflected work on August 2, 2022. Exhibit 48 at 53 (Dr. Jeret's invoice). Dr. Jeret did not invoice for time on this case before August 2, 2022. One of Dr. Jeret's three activities billed on August 2, 2022 was to "Begin draft of report---outline, basic info." Id. Furthermore, a paralegal in Ms. Toale's office created an entry on August 2, 2022 stating "Review correspondence regarding expert retention of Dr. Jeret, update file notes." Timesheets. When asked during the February 13, 2025 status conference about this entry, Ms. Toale stated: "it could be better worded because, as you say, the retention was much earlier." Tr. 17.

Regardless of the lack of clarity as to when the firm retained Dr. Jeret, the fact remains that Ms. Toale worked on the topic of Guillain-Barré syndrome. Ms. Toale spent approximately five hours researching the medical literature about Guillain-Barré syndrome and vasculitis. Timesheets (July 30-31, 2022). On August 1, 2022, she spent 3.0 hours on the tasks of "Additional review of records to determine what to provide to GBS expert for preliminary review; multiple emails with both experts."

Like Dr. Sheikh, Dr. Jeret has been retained by petitioners in the Vaccine Program previously. In early August 2022, Dr. Jeret spent six hours working on the case. Exhibit 48 at 53. Dr. Jeret did not submit a report. He did not support a diagnosis of Guillain-Barré syndrome. Pet'r's Memorandum, filed June 18, 2024, at 10.

In Ms. Toale's view, Dr. Jeret's work did not duplicate the work of Dr. Sheikh. Tr. 28-29.

On August 14, 2022, Ms. Toale informed Ms. Pisani about the results of the neurology review. Timesheets. This second opinion satisfied Ms. Toale that a

claim based upon Guillain-Barré syndrome could not be developed. Ms. Toale did not seek an opinion from a third neurologist.

*Dr. Teitel, rheumatologist*

To return to an earlier step, the June 1, 2022 order required Ms. Pisani to file her expert report by July 30, 2022. From comments during the status conference, Ms. Toale was aware that additional enlargements of time should not be anticipated.

Whether Dr. Teitel was performing any work is unknown. Although the Expert Instructions, issued Oct. 6, 2021, directed the expert to create invoices that show the date activities were performed, Dr. Teitel's October 23, 2022 invoice does not contain this information. See Exhibit 48 at 57. In the February 13, 2025 status conference, Ms. Toale commented that Dr. Teitel "has some of the worst billing of any expert that I've ever used. Like, I will admit that right here." Tr. 8. When asked what work Dr. Teitel was performing in July 2022, Ms. Toale looked at Dr. Teitel's invoice and stated: "I don't know what he was doing on a day-to-day or even week-to-week basis." Tr. 9.

After the February 13, 2025 status conference, Ms. Toale averred that she had received a draft report from Dr. Teitel on July 30, 2022. Exhibit 54 at 4-5. Ms. Toale corroborated her account by providing an email from Dr. Teitel. Exhibit 54, appendix 1.

Ms. Toale needed to explain when she received a draft report from Dr. Teitel for two reasons. First, as just stated, Dr. Teitel's own billing records are not good. Although Dr. Teitel billed some time for a draft report, his invoice lacks the date that this activity was performed. Exhibit 48 at 57. Second, Ms. Toale's billing record contains an error. Originally, Ms. Toale wrote that she spent time on July 30, 2022 on the following: "Review records summary to analyze draft neurology expert report; review report." Timesheets. However, after the February 13, 2025 status conference, Ms. Toale realized that the explanation she gave of her time entry was wrong. She had not reviewed a draft report from a neurologist; she had actually reviewed a draft report from a rheumatologist, Dr. Teitel. Exhibit 54 at 4-6.

In her supplemental affidavit, Ms. Toale averred that "Dr. Teitel's initial draft was brief, and did not closely align with this Court's expert instructions." Exhibit 54 at 8. Ms. Toale, therefore, "undertook draft revisions and additions." Id. Starting in mid-August, Ms. Toale's spent more than 30 hours on the report for Dr. Teitel. Timesheets; see also Exhibit 54 at 14. At the end, she emailed Dr.

6

Teitel a revised draft. Timesheet (entry for Aug. 26, 2022). In her supplemental affidavit, Ms. Toale also provided an email from Dr. Teitel in which he transmitted the final report for Ms. Toale to file. Exhibit 54 at 17, appendix 2.[6]

Regardless of Ms. Toale's supplemental affidavit, Ms. Toale makes a strong point regarding Dr. Teitel's report. Exhibit 54 at 17. As filed, it contains a signature for Dr. Teitel. Exhibit 24 at 14. According to the Expert Instructions, a "signature confirms that the report sets forth the expert's opinions." Instructions, issued Oct. 6, 2021, at 2.

Dr. Teitel's report was filed as Exhibit 24. It is 14 pages with additional pages for references. He stated that he spent "approximately 5 hours searching for medical literature in this case." Id. at 1. He opined that "the Influenza vaccine administered 10/10/18 substantially contributed to Mr. Pisani's subsequent development of cryoglobulinemic vasculitis with severe neurological manifestations and death. This was clearly a significant aggravation of his (likely) preexisting Sjogren's disease." Id. at 9.

Ms. Toale memorialized that she reviewed an invoice from Dr. Teitel on September 22, 2022. Timesheets; see also Exhibit 54 at 18. It appears that Dr. Teitel revised his invoice because the one that was filed is dated October 23, 2022. Exhibit 48 at 57. As noted previously, this invoice does not list the dates that Dr. Teitel did various tasks. Ms. Toale "review[ed] fee documentation for acceptability; create note to file that fee documentation should be paid." Timesheet (entry for Oct. 27, 2022). Many problems could have been avoided if Ms. Toale had rejected this invoice as not complying with the October 6, 2021 Expert Instructions and insisted that Dr. Teitel document his activities with a greater degree of specificity.

*The Secretary's Expert Report*

After receiving one enlargement of time, the Secretary countered Dr. Teitel's report with a report from a rheumatologist he had retained, Maxime Kinet. Exhibit A, filed Jan. 3, 2023. Dr. Kinet disputed several aspects of Dr. Teitel's report and explained why the flu vaccine was not likely to have aggravated pre-

---

[6] During the February 13, 2025 status conference, Ms. Toale originally interpreted Dr. Teitel's entry that he spent 4.5 hours drafting a report on some unspecified date (see Exhibit 48 at 47), as evidence that Dr. Teitel reviewed the report that she had drafted and modified it. See Tr. 36. However, after the February 13, 2025 status conference, Ms. Toale attributed Dr. Teitel's work on drafting the report as occurring before July 30, 2022. Exhibit 54 at 4-6.

existing Sjogren's disease by prompting the development of cryoglobulinemic vasculitis.

*Attempt to Obtain a Responsive Report from Dr. Teitel*

Ms. Pisani anticipated presenting a reply report from Dr. Teitel.  Pet'r's Status Rep., filed Mar. 8, 2023.  Throughout March and April, Ms. Toale emailed Dr. Teitel.  See Timesheets.[7]  Ms. Pisani did not file a responsive report by the deadline that she had requested and, therefore, sought additional time.  Essentially, Ms. Pisani represented that Dr. Teitel was too busy with the paycheck protection program, working in the rheumatology service, and traveling.  Pet'r's Mot., filed May 12, 2023.  The deadline was accordingly extended to July 11, 2023.  Order, issued May 12, 2023.

Ms. Pisani did not meet this deadline either.  As required by the May 12, 2023 order, Ms. Pisani supported her request for additional time with a letter from Dr. Teitel.  He stated that "Due to obligations to related to patient care and other medicolegal consulting deadlines, I need further time. . . . A deadline of 9/30/2023 would be sufficient to allow further review of the expert rebuttal report."  Exhibit 46.  Thus, Ms. Pisani was afforded additional time, and a deadline was set for October 2, 2023.

Despite Dr. Teitel's assurances in his letter that he would produce a report by September 30, 2023, he did not.  It appears that in September 2023, he spent less than one hour working on the report.  Exhibit 48 at 63.

Without a rebuttal report from Dr. Teitel, Ms. Pisani sought a stay of her case.  The basis was "Dr. Teitel has stopped responding to calls, emails and texts regarding today's deadline."  Pet'r's Mot., filed Oct. 2, 2023.[8]  This stay was granted until November 3, 2023.

While the case was stayed, Dr. Teitel spent approximately 1.5 hours on emails across various dates.  Exhibit 48 at 63.  Ms. Toale's time entries are consistent in that she replied to emails with Dr. Teitel.  Timesheets (entries for Oct. 4, 2023; Oct. 10, 2023; Oct. 20, 2023); Tr. 39.  In Ms. Pisani's November 3, 2023

---

[7] In the corresponding period, Dr. Teitel's invoice lists only a single entry for time he spent emailing with Ms. Toale.  Exhibit 48 at 63.

[8] Dr. Teitel invoice indicates that the day before Ms. Pisani sought a stay, he spent 0.1 hours on email.  Exhibit 48 at 63 (Oct. 1, 2023).

status report, she acknowledged that Dr. Teitel had reappeared. However, he did not anticipate submitting a rebuttal report.

*End of Entitlement Phase*

In the ensuing status conference, the undersigned stated that without a rebuttal report, Ms. Pisani was unlikely to be found entitled to compensation. Eventually, Ms. Pisani and the Secretary agreed to dismiss the case. Ms. Pisani's case ended with an order concluding proceedings pursuant to Vaccine Rule 21(a).

### B.    Attorneys' Fees Phase

Ms. Pisani requested a total of $159,225.47 in attorneys' fees and costs. Pet'r's Mot., filed June 18, 2024. Ms. Pisani supported her request with various materials, including a memorandum of law regarding the reasonableness of costs associated with her experts. See Exhibits 47-53. The Secretary deferred to the undersigned's assessment, submitting his generic response. Resp't's Resp., filed July 1, 2024. Ms. Pisani submitted her firm's relatively generic reply. Pet'r's Reply, filed July 1, 2024.

A preliminary review suggested there was some confusion about Dr. Teitel's invoices. Thus, supplemental information was requested. Order, issued Dec. 23, 2024. Ms. Pisani attempted to address the request for additional information. Pet'r's Resp., filed Jan. 17, 2025.

As noted previously, a status conference was held on February 13, 2025. This status conference helped to clarify some aspects of the work the experts had done. However, the status conference also illuminated that Ms. Toale did not know what the experts, especially Dr. Teitel, were doing.[9]

Following the status conference, Ms. Toale informally requested an opportunity to respond to topics discussed in the February 13, 2025 status conference. See Order, issued Feb. 21, 2025.

Ms. Toale corrected and clarified some of the answers she provided during the February 13, 2025 status conference via the supplemental affidavit cited above. Exhibit 54. Although Ms. Toale's affidavit references two emails from Dr. Teitel as appendices, those emails were filed on April 15, 2025. Ms. Toale declined the

---

[9] During the status conference, the undersigned asked a poorly phrased question that upset Ms. Toale. Although the undersigned apologized during the status conference, the undersigned wishes again to express remorse.

right to seek fees associated with time she spent on defending the fee application. Exhibit 54 at 17 n.22.

## II.    Eligibility for Attorneys' Fees and Costs

Ms. Pisani did not receive compensation.  Therefore, an award of attorneys' fees and costs is not mandatory.  Rather, Ms. Pisani becomes eligible for an award of attorneys' fees and costs upon a showing that "the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought."  42 U.S.C. § 300aa–15(e).  Upon a finding of reasonable basis, a special master has discretion to award (or not to award) reasonable attorneys' fees and costs.  James-Cornelius v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1379 (Fed. Cir. 2021); Wirtshafter v. Sec'y of Health & Hum. Servs., 155 Fed. Cl. 665, 675-76 (2021) (after determining that as a matter of law, reasonable basis supported petitioner's claim, remanding for special master to determine whether to exercise discretion to award reasonable attorneys' fees and costs).  These two separate parts of the analysis are explored below.

### A.    Good Faith and Reasonable Basis

Ms. Pisani did not receive compensation.[10]  Therefore, she is not entitled to an award of attorneys' fees and costs as a matter of right.  As an unsuccessful petitioner, Ms. Pisani becomes eligible for an award of attorneys' fees and costs upon a showing of "good faith and reasonable basis."  42 U.S.C. § 300aa–15(e).

Here, although Ms. Pisani's good faith is accepted, there are two complications regarding reasonable basis.  The first is somewhat semantic and the second is more substantive.

The semantic point is that the crux of Ms. Pisani's September 23, 2020 petition alleges that Mr. Pisani suffered Guillain-Barré syndrome.  Pet. ¶ 26.[11]  As

---

[10] This case resolved via an order concluding proceedings.  This method of disposition may lead to an award of attorneys' fees and costs.  See Grice v. Sec'y of Health & Hum. Servs., 36 Fed. Cl. 114 (1996).  The question is whether good faith and reasonable basis support the claims.  See Carter v. Sec'y of Health & Hum. Servs., 132 Fed. Cl. 372, 375 (2017) (denying motion for review of decision finding that petitioner lacked reasonable basis in a case that ended with an order concluding proceedings).

[11] To be sure, the petition contains alternative allegations referring to other injuries.  Pet. ¶ 27.  However, these vague assertions cannot support a claim for compensation.  See, e.g., Lapierre v. Sec'y of Health & Hum. Servs., No. 17-227V, 2019 WL 6490730, at *17 (Fed. Cl. Spec. Mstr. Oct. 18, 2019) ("the mere fact that the Petitioner's alleged injury is more vague in nature is not necessarily dispositive of his claim. Respondent is, however, on firm ground in

such, per the Vaccine Act, Ms. Pisani is required to show that reasonable basis supported this claim because the statute demands reasonable basis "for the claim for which the petition was brought." 42 U.S.C. § 300aa–15(e). Here, Ms. Pisani dropped the claim for Guillain-Barré syndrome. See Order, issued Oct. 6, 2021 (noting that petitioner stated that "though the correct diagnosis is unclear at this time, the expert will help to clarify that point of petitioner's case"); Order, issued June 1, 2022 (noting that petitioner stated in a status conference that she would not be pursuing a claim for Guillain-Barré syndrome); see also Exhibit 24 (expert report of Dr. Teitel, discussing Mr. Pisani's Sjogren's syndrome). Thus, the better practice would have been to amend the petition to allege that the flu vaccine significantly aggravated a pre-existing condition, Sjogren's syndrome. But, the discrepancy can be overlooked.

The more substantive concern is whether reasonable basis supports a claim that the flu vaccine significantly aggravated Mr. Pisani's Sjogren's syndrome. Normally, the presence of an expert's report would confer reasonable basis. See, e.g., James-Cornelius on Behalf of E. J. v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1379 (Fed. Cir. 2021); but see Perreira v. Sec'y of Dep't of Health & Hum. Servs., 27 Fed. Cl. 29, 33-34 (1992) (special masters have discretion to deny fees even when an expert has provided testimony), aff'd, 33 F.3d 1375, 1377 (Fed. Cir. 1994).

Here, Ms. Toale's predominant role in drafting the report for Dr. Teitel raised questions about the report. These questions arose, in part, because of the lack of entries from Dr. Teitel. However, during the February 13, 2025 status conference, Ms. Toale accurately pointed out that Dr. Teitel signed his report. Exhibit 24 at 14. Ordinarily, this signature should demonstrate that the expert agrees with the content of the report. See Instructions, issued Oct. 6, 2021, at 2.

---

maintaining that proof of *some* injury (as opposed to simply symptoms) is required to prevail in a Vaccine Act case (since the absence of an injury at all will end the proceedings without any need to consider the Althen prongs)") (citing Lasnetski v. Sec'y of Health & Human Servs., 128 Fed. Cl. 242, 262 (Fed. Cir. 2017) (symptoms alone could not satisfy petitioner's burden, because "a symptom or manifestation could indicate any number of different underlying injuries, each with its own pathology, making it impossible for the court to accurately determine causation") aff'd, 696 F. App'x 497 (2017)).

Moreover, after the status conference, Ms. Toale submitted emails showing that Dr. Teitel presented a draft report to Ms. Toale.

Therefore, Mr. Pisani has demonstrated that reasonable basis supports a claim that the flu vaccine significantly aggravated his Sjogren's syndrome. Although, again, this is not the claim set forth in the petition, this lack of precision will be overlooked. Mr. Pisani is, therefore, eligible for an award of attorneys' fees and costs.

Technically, Mr. Pisani's eligibility for an award of attorneys' fees and costs does not end the matter. Even when a petitioner establishes good faith and reasonable basis, "a special master retains discretion to grant or deny attorneys' fees." James Cornelius, 984 F.3d at 1379. Here, as a matter of discretion, Mr. Pisani is awarded a reasonable amount of attorneys' fees and costs. What is reasonable is taken up next.

## III.   Reasonable Amount of Attorneys' Fees and Costs

In light of the Secretary's lack of objection, the undersigned has reviewed the fee application for its reasonableness. See McIntosh v. Sec'y of Health & Human Servs., 139 Fed. Cl. 238 (2018). Mr. Pisani's application is divided into two components: attorneys' fees and attorneys' costs.

### A.   Reasonable Attorneys' Fees

The Federal Circuit has approved the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. This is a two-step process. Avera v. Sec'y of Health & Human Servs., 515 F.3d 1343, 1348 (Fed. Cir. 2008). First, a court determines an "initial estimate … by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347-48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Second, the court may make an upward or downward departure from the initial calculation of the fee award based on specific findings. Id. at 1348. Here, because the lodestar process yields a reasonable result, no additional adjustments are required. Instead, the analysis focuses on the elements of the lodestar formula, a reasonable hourly rate and a reasonable number of hours.

#### 1.   Reasonable Hourly Rates

Under the Vaccine Act, special masters, in general, should use the forum (District of Columbia) rate in the lodestar calculation. Avera, 515 F.3d at 1349. There is, however, an exception (the so-called Davis County exception) to this general rule when the bulk of the work is done outside the District of Columbia

12

and the attorneys' rates are substantially lower.  Id. 1349 (citing Davis Cty.  Solid Waste Mgmt. and Energy Recovery Special Serv. Dist. v. U.S. Envtl.  Prot. Agency, 169 F.3d 755, 758 (D.C. Cir. 1999)).

For cases in which forum rates apply, McCulloch provides a framework for consideration of appropriate ranges for attorneys' fees based upon the experience of the practicing attorney. McCulloch v. Sec'y of Health & Hum. Servs., No. 09-293V, 2015 WL 5634323, at *19 (Fed. Cl. Spec. Mstr. Sept. 1, 2015), mot. for recons. denied, 2015 WL 6181910 (Fed. Cl. Spec. Mstr. Sept. 21, 2015).

The attorneys who logged the most hours on the case were Anne Toale (118.6 hours) and Isaiah Kalinowski (107 hours). See Timesheets at 41-42.  Ms. Toale, Mr. Kalinowski, and their associates practice in Washington D.C. and in Florida.  These areas are deemed in forum or comparable to it. See Nicol v. Sec'y of Health & Hum. Servs., No. 21-1837V, 2023 WL 4855195, at *2 (Fed. Cl. Spec. Mstr. July 6, 2023) (citing Dezern v. Sec'y of Health & Hum. Servs., No. 13-643V, 2016 WL 6678496, at *4 (Fed. Cl. Spec. Mstr. Oct. 14, 2016).  Accordingly, the rates set forth in McCulloch are appropriate.

Petitioner requests compensation for Ms. Toale as follows:

| Year | Rate |
|------|------|
| 2021 | $475 |
| 2022 | $500 |
| 2023 | $535 |
| 2024 | $570 |

Ms. Toale has routinely been awarded these rates in other cases in the Office of Special Masters.  See, e.g., Ferrari v. Sec'y of Health & Hum. Servs., No. 19-93V, 2024 WL 4503644, at *2 (Fed. Cl. Spec. Mstr. Aug. 22, 2024); Goettl v. Sec'y of Health & Hum. Servs., No. 21-1644V, 2024 WL 2892844, at *2 (Fed. Cl. Spec. Mstr. May 14, 2024); see also Exhibit 50 at 2-3 (affidavit of Ms. Toale, citing cases).  These rates are reasonable.

Petitioners have requested the following rates for Mr. Kalinowski:

| Year | Rate |
|------|------|
| 2019 | $383 |
| 2020 | $405 |
| 2021 | $430 |

13

These rates are reasonable and are consistent with what Mr. Kalinowski has been awarded in the past. <u>See, e.g.</u>, <u>Godfrey v. Sec'y of Health & Hum. Servs.</u>, No. 17-1419V, 2023 WL 5666162, at *5 (Fed. Cl. Spec. Mstr. Aug. 15, 2023); <u>Godek v. Sec'y of Health & Hum. Servs.</u>, No. 19-106V, 2022 WL 2903360, at *3 (Fed. Cl. Spec. Mstr. June 30, 2022).

Various other attorneys from the firm also contributed to the case. Petitioner requests a rate of $400 for the work of Altom Maglio and FJ Caldwell in 2019; rates of $450 and $480 for the work of Danielle Strait in 2023 and 2024; rates of $415 and $490 for the work of Diana Stadelnikas in 2019 and 2022; and a rate of $385 for the work of Joseph Vuckovich in 2022. Timesheets at 41. These rates are reasonable and are consistent with previous awards to the firm and its attorneys. <u>See, e.g.</u>, <u>Ferrari</u>, 2024 WL 4503644, at *2; <u>Goettl</u>, 2024 WL 2892844, at *2; <u>Huerta v. Sec'y of Health & Hum. Servs.</u>, No. 21-2100V, 2024 WL 1859820, at *2 (Fed. Cl. Spec. Mstr. Apr. 4, 2024); <u>A.P. v. Sec'y of Health & Hum. Servs.</u>, No. 17-784V, 2023 WL 9502993, at *2 (Fed. Cl. Spec. Mstr. Dec. 20, 2023).

Finally, petitioner requests an award for the work completed by the firm's paralegals. The firm differentiates between "paralegals" and "medical record paralegals." The requested rates are:

| Year | Paralegal Rate | Medical Record Paralegal Rate |
|---|---|---|
| 2018 | $148 | -- |
| 2019 | $154 | $145 |
| 2020 | $160 | $145 |
| 2021 | $160 - $165 | $155 |
| 2022 | $160 - $170 | $160 |
| 2023 | $180 | $170 |
| 2024 | $190 | -- |

Timesheets at 41-42. These rates are reasonable and are consistent with previous awards to the firm. <u>See, e.g.</u>, <u>Murphy v. Sec'y of Health & Hum. Servs.</u>, No. 21-1334V, 2024 WL 982645, at *2 (Fed. Cl. Spec. Mstr. Feb. 1, 2024); <u>Hendrickson v. Sec'y of Health & Hum. Servs.</u>, No. 17-006V, 2023 WL 166410, at *3 (Fed. Cl.

Spec. Mstr. Jan. 11, 2023); <u>Stuart v. Sec'y of Health & Hum. Servs.</u>, No. 16-940V, 2022 WL 176145, at *5-6 (Fed. Cl. Spec. Mstr. Jan. 5, 2022).

> 2.      Reasonable Number of Hours

The second factor in the lodestar formula is a reasonable number of hours. Reasonable hours are not excessive, redundant, or otherwise unnecessary. <u>See</u> <u>Saxton v. Sec'y of Health & Human Servs.</u>, 3 F.3d 1517, 1521 (Fed. Cir. 1993). The Secretary also did not directly challenge any of the requested hours as unreasonable.

Mr. Kalinowski spent a total of 61.3 hours solely dedicated to "review[ing] [medical records] for filing and integrat[ing] information into ARMOR medical summary."  A few other entries contain this task in addition to other work.  <u>See,</u> <u>e.g.</u>, entry for 06/29/2020.  For the most part, Mr. Kalinowski provided detailed entries regarding the medical records, citing the exhibits and pages he worked on. There is one instance of block billing on December 22, 2019, where Mr. Kalinowski logged 11.2 hours for reviewing various documents, reviewing and integrating medical records, and preparing exhibits for filing.  However, this one instance does not warrant reduction.

Ms. Toale's time entries also provide sufficient descriptions of her activities. However, the amount of money charged for her drafting of an expert's report is unreasonable.

As an initial point, Ms. Toale was the primary drafter of the report that Dr. Teitel eventually signed.  From the document filed into the record on June 18, 2024, Dr. Teitel emailed a draft report on July 30, 2022.  According to his invoice, before July 30, 2022, Dr. Teitel appears to have spent a total of 6.3 hours reviewing medical literature and drafting the report.  Exhibit 48 at 57.[12]

Between August 17, 2022 and August 26, 2022, Ms. Toale spent approximately 30.3 hours drafting additions and revisions to Dr. Teitel's report and finding medical literature for the same.  Timesheets at 29-30.  In other words, Ms. Toale spent nearly five times as many hours as Dr. Teitel did drafting Dr. Teitel's

---

[12] The invoice does not contain dated entries, so it is uncertain whether all this work was completed prior to Dr. Teitel's sending of the draft on July 30, 2022.  However, Dr. Teitel's next invoice has activities from July 8, 2022 through October 26, 2023, and contains no entries for literature review or report writing for the 2022 dates.  It is presumed that these invoices do not overlap and that all literature review and report writing on the first report was recorded in the first invoice and took place prior to July 8, 2022.

report in 2022.[13]  This disparity is concerning.  It is unclear how much of the report is Dr. Teitel's own work.  The disproportionate number of hours spent by Ms. Toale on the report tends to suggest that it is predominantly her work.

Although Dr. Teitel signed and adopted the draft as revised by Ms. Toale, it is unclear whether and how substantively he actually reviewed the draft.  Ms. Toale sent him the revised draft and additional medical literature on August 26, 2022.  Timesheets at 31.  Dr. Teitel's second invoice reports that he exchanged emails about the case in July 2022.  The next entry is one for emails in September 2022.  Exhibit 48 at 63.  There are no notes for literature review or report writing in August 2022.

Ostensibly, some portion of Dr. Teitel's first invoice (dated October 23, 2022) could include time spent reviewing Ms. Toale's work.  However, these entries are undated and only the totals are reported.  It is therefore impossible to ascertain whether any of this time was spent on Ms. Toale's edited draft of the report, or if it all applies to the initial draft.  Additionally, it is unclear why entries on this first invoice would overlap with his second invoice, which contains entries for July of 2022.  The only entry indicating that Dr. Teitel might have, in fact, reviewed the report beyond signing it is Ms. Toale's entry for .3 hours spent on "Emails with expert regarding final draft report" on August 30, 2022 (the date of filing).  Timesheets at 31.  However, between her email of the revised draft on August 25 and the emails on August 30, there are no entries for communication with Dr. Teitel regarding the report and revisions.  In sum, it appears—but is not certain—that Dr. Teitel did not spend much, if any, time reviewing the report before signing off on it.

To be sure, Ms. Toale made some effort to involve Dr. Teitel in the report drafting, in that she sent it to him for review and followed up via email on the date of filing.  But, ultimately, the report appears to be overwhelmingly the work of Ms. Toale.

In the February 13, 2025 status conference, Ms. Toale argued that in the Vaccine Program, attorneys are permitted to write reports that experts review and sign.  For this proposition, Ms. Toale relied upon Gruber v. Sec'y of Health & Human Servs., 91 Fed. Cl. 773 (2010).  Although Gruber is not a precedential

---

[13] Dr. Teitel recorded that he spent an additional 2.2 hours on literature review and 1.1 hours on report writing in May and July, 2023.  Exhibit 48 at 63.  As this was several months after the first report was filed, it seems likely that this was work on a potential second report that was never completed.

opinion from the Federal Circuit and, therefore, is not controlling, Ms. Toale's reliance on Gruber is reasonable as the Expert Instructions cited Gruber. However, Gruber does not extend the authority to write expert reports to attorneys carte blanche. Gruber recognizes "there is a point at which counsel's involvement, or certainly, direction as to the outcome of an expert opinion crosses the line of propriety." Gruber, 91 Fed. Cl. at 795.

Moreover, after Gruber, opinions from outside of the Vaccine Program have frowned upon an attorney's drafting an expert's report. For example, in Gerke v. Travelers Ins. Co., 289 F.R.D. 316 (D. Or. 2013), a district court ordered production of draft reports because "there was a question whether Plaintiff's counsel's involvement in the creation of Painter's expert report exceeded Rule 26's limits." Id. at 328. The district court reached this conclusion despite the testimony of the expert, whose name was Painter, that "the final report's conclusions and opinions were his." Id. Quoting McClellan v. I-Flow Corp., 710 F.Supp.2d 1092 (D. Or. 2010), Gerke stated "an expert report 'ghost-written' from 'whole cloth' violates the spirit, if not the letter of [Rule 26 of the Federal Rules of Civil Procedure]." 289 F.R.D. at 326. Gerke reserved, for a later day, whether the opinions of the expert were admissible. Id. at 329 n.6.

A more severe penalty, the barring of testimony from an expert named Michael Justice, occurred in Numatics, Inc. v. Balluff, Inc., 66 F.Supp.3d 934 (D. Mi. 2014). Based upon Mr. Justice's deposition testimony, the Court found that he was "nothing more than a 'highly qualified puppet' and the opinions in his report do not reflect his own reasoned views of the case." Id. at 945.

The purpose of citing Gruber, Gerke, and Numatics is to show that an attorney's drafting of an expert's report, even if within the bounds of attorney ethics, can have negative consequences.[14] Thus, the better practice is for an expert to take the lead in presenting his (or her) opinions.

For her work in drafting a report for a medical doctor in 2022, Ms. Toale has proposed charging $500. This rate of $500 is appropriate when Ms. Toale performs duties for which she has received legal training and has legal experience. A pertinent example is drafting a brief. By way of contrast, Dr. Teitel attended medical school, became board certified in 1992, and routinely treats people with

---

[14] For more general evaluations of this issue, see 8A Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, Fed. Prac. & Proc. Civ. § 2031.1 n. 17 (3d ed.), and Arthur F. Greenbaum, Expert Witness Reports in Federal Civil Litigation: The Role of the Attorney in the Expert Witness Report's Preparation, 48 Hofstra L. Rev. 131 (2019).

rheumatologic diseases. Ms. Toale, although a competent attorney, possesses none of these qualifications. Dr. Teitel charged $360 per hour for his work. See Exhibit 48 at 62. Ms. Toale will be compensated at Dr. Teitel's rate for her time on these tasks.[15] This results in a reduction of $4,242, making the potential compensation for this portion of Ms. Toale's work $10,908.[16]

An additional adjustment is warranted. The expert report was not particularly helpful to petitioner's case. The report does not clearly explain a mechanism by which a flu vaccine could cause cryoglobulinemic vasculitis. The report relies heavily on case reports, which do not propose a causal mechanism. See Exhibit 24 at 10-13; see also Exhibit A at 7. The report also cites to an article by Brauner et al. (Exhibit 39) and states that this study "provides a reliable medical theory how influenza vaccination can cause B cell activation in untreated [primary Sjögren's syndrome] patients, leading to [cryoglobulinemic vasculitis]." Exhibit 24 at 11. However, the Brauner article does not discuss vasculitis.

Dr. Teitel's report also discusses a theory involving the reactivation of latent cryoglobulin producing B-cell clones. Id. at 12-13. As Dr. Kinet opined in his rebuttal report, "This proposed mechanism is speculative at best and supported by no other experimental evidence." Exhibit A at 7. Furthermore, the study and case report Dr. Teitel relied upon for this theory involved the COVID vaccine and patients with pre-existing vasculitis, neither of which are relevant to the case at hand.

Furthermore, as Dr. Kinet noted, Dr. Teitel's report does not state when he believed petitioner's cryoglobulinemic vasculitis began. See Exhibit A at 8. Mr. Pisani received his vaccine on October 10, 2018. Dr. Teitel states, "The finger numbness and right leg pain," which was reported on October 30, 2018, "constituted the onset of his CV, in my opinion." Exhibit 24 at 2. Yet, he later stated that Mr. Pisani's injury manifested "five days after vaccination." Id. at 13. This appears to refer to petitioner's October 15, 2018 complaint to a doctor about gastrointestinal symptoms and lack of appetite. Id. at 1-2. However, at that time, Mr. Pisani stated that his symptoms had started two weeks prior—meaning they

---

[15] In Gruber, there was arguably an efficiency to Ms. Toale's drafting the expert's report because Ms. Toale was then charging either $250.00 per hour or $275.00 per hour and the expert was charging $350.00 per hour. However, here, Ms. Toale has proposed charging $140.00 per hour more than Dr. Teitel.

[16] (30.3 hours x $500) – (30.3 hours x $360) = $15,150 - $10,908 = $4,242.

would predate the vaccine.  Id.  In sum, Dr. Teitel's report did little to advance petitioner's case.

When experts do not perform as well as expected, special masters may reduce their hourly rates in particular cases.  Frantz v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 137, 146 (2019); Murray v. Sec'y of Health & Hum. Servs., No. 19-1976V, 2023 WL 9503422, at *2-3 (Fed. Cl. Spec. Mstr. Dec. 22, 2023) (reducing expert's rate from $500 per hour to $100 per hour).  Likewise, special masters may reduce attorney's rates.  Saxton v. Sec'y of Health & Hum. Servs., 3 F.3d 1517, 1521 (Fed. Cir. 1993).  "The essential goal in shifting fees (to either party) is to do rough justice, not to achieve auditing perfection. So trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time."  Fox v. Vice, 563 U.S. 826, 838 (2011); see also Florence v. Sec'y of Health & Hum. Servs., No. 15-255V, 2016 WL 6459592, at *5 (Fed. Cl. Spec. Mstr. Oct. 6, 2016).  To achieve rough justice, a further reduction of one-third ($3,636) will be applied to *this portion* of Ms. Toale's fees.  On the other hand, all of Ms. Toale's hours spent on writing the report for Dr. Teitel are accepted as reasonable.[17]

The remainder of the fees incurred by Ms. Toale and the other attorneys at mctlaw are reasonable and awarded in full.  Accordingly, a reasonable amount of attorneys' fees and costs is $129,339.70.[18]

## B.    **Costs Incurred**

Like attorneys' fees, a request for reimbursement of costs must be reasonable.  Perreira v. Sec'y of Health & Human Servs., 27 Fed. Cl. 29, 34 (Fed. Cl. 1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). Petitioner requests a total of $22,007.77 in attorneys' costs.  Exhibit 48 at 1-2.  The costs include postage, legal and medical research, filing fees, acquiring medical records, and payment to an expert locating service (Guidepoint Global).  Id.  Most of these costs are routine.  Most are reasonable and adequately documented.

Within the category of non-expert costs, the only unreasonable charge is the payment to Guidepoint Global for presenting the services of Dr. Teitel.  Ms.

---

[17] The crediting of all Ms. Toale's hours differentiates the outcome from the special master's decision in Gruber.  There, the Court vacated the special master's reduction of approximately 45 hours of attorney time and 14 hours of paralegal time.  91 Fed. Cl. at 796.

[18] $137,217.70 (requested fees) - $4,242 (reduction of hourly rate on expert report) - $3,636 (reduction of one-third for expert report) = $129,339.70.

Toale's law firm has paid $2,500.00.  However, the product that Guidepoint Global delivered was extremely problematic.  Dr. Teitel, apparently, was not the primary draftsperson of the report he signed.  He kept poor records of his time.  When a responsive report was required, he failed to communicate with Ms. Toale.  Under these circumstances, it appears that Guidepoint Global did not fulfill its bargain and therefore, a refund of a portion of its charge would be appropriate.  Accordingly, the charge associated with Guidepoint Global is reduced by half, resulting in a deduction of $1,250.00.

Ms. Pisani also seeks reimbursement for mctlaw's payments to experts.  The firm consulted three experts for the case: two neurologists (Dr. Sheikh and Dr. Jeret) and a rheumatologist (Dr. Teitel).  Although the firm ultimately only retained Dr. Teitel to write an expert report, mctlaw requests $1,000 (Dr. Sheikh) and $2,100 (Dr. Jeret) to pay the neurologists for their consultations.  Ms. Toale explained in a supplemental statement that these experts were consulted because there "is record support for a diagnosis of GBS," and so "it was incumbent upon counsel to ensure that there was no conceivable path forward for a table claim" and "to thoroughly analyze the viability of this table claim before it could be abandoned."  Pet'r's Suppl. Mem., filed Jan. 17, 2025, at 2.  Ms. Toale noted that "consulting experts who incurred minimal expert expenses reviewing a case for potential engagement" have been compensated in other Program cases and cited examples.  Id.  The Secretary did not raise any objections to this consultation of a second neurology expert.

Reasonable expert fees are determined using the lodestar method, in which a reasonable hourly rate is multiplied by a reasonable number of hours.  Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013).  To determine the reasonableness of an expert's proposed rate, special masters may consider the "area of expertise; the education and training required to provide necessary insight; the prevailing rates for other comparably respected available experts; the nature, quality, and complexity of the information provided; [and] the cost of living in the expert's geographic area."  Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 206 (2009). Furthermore, "[p]etitioner has the burden of providing the foregoing information concerning expert fees."  Id.

Dr. Sheikh spent a total of two hours over the course of two days reviewing the case materials and communicating with petitioner's attorney.  Exhibit 48 at 40.  He billed a rate of $500 per hour for the consultation.  Dr. Sheikh has previously been awarded this rate.  See, e.g., Wynne v. Sec'y of Health & Hum. Servs., No. 17-1908V, 2022 WL 1869355, at *3 (Fed. Cl. Spec. Mstr. May 3, 2022); Shinskey v. Sec'y of Health & Hum. Servs., No. 15-713V, 2019 WL 2064558, at *5 (Fed.

Cl. Spec. Mstr. May 9, 2019).  Dr. Sheikh's invoice is reasonable and will be awarded in full.  See Kriebel v. Sec'y of Health & Hum. Servs., No. 21-1491V, 2025 WL 1235136, at *3 (Fed. Cl. Spec. Mstr. Apr. 1, 2025) (awarding Dr. Sheikh a rate of $600 per hour for 7.75 hours of work reviewing records and providing a consultation).

Dr. Jeret billed $350 per hour for six hours of work reviewing petitioner's records, reviewing medical literature, communicating with petitioner's attorney, and writing a preliminary report.  Exhibit 48 at 53.  Dr. Jeret has previously been awarded $500 per hour for work performed in 2022 in cases in which he was formally retained and produced an expert report.  See, e.g., Williams v. Sec'y of Health & Hum. Servs., No. 19-1269V, 2024 WL 1253768, at *5 (Fed. Cl. Spec. Mstr. Feb. 28, 2024); Nieves v. Sec'y of Health & Hum. Servs., No. 18-1602V, 2023 WL 7131801, at *4 (Fed. Cl. Spec. Mstr. Oct. 2, 2023).  Dr. Jeret's rate of $350 per hour for a consultation and the work performed is reasonable and will be awarded in full.

It appears that Dr. Teitel has not previously participated in the Vaccine Program.  Dr. Teitel billed $360 per hour for his work.  Dr. Teitel graduated from medical school in 1985, completed an internal medicine residency in 1988, and completed a rheumatology fellowship in 1992.  See Exhibits 24 and 25.  He is board certified in internal medicine and rheumatology.  At the time of writing the report, he was a Clinical Associate Professor at NYU Langone and an Assistant Attending in the Hospital for Special Surgery at Weill-Cornell University Medical Center.  Id.  Dr. Teitel has been published in rheumatology journals numerous times.  Exhibit 25 at 3-5.  A rate of $360 is potentially reasonable for an expert with Dr. Teitel's experience.

Dr. Teitel's invoices amount to $14,574.54.  Dr. Teitel spent 1.8 hours researching medical literature and 4.5 hours drafting the expert report, amounting to 6.3 hours of work researching and writing the report.  As noted, Ms. Toale spent nearly five times as many hours as Dr. Teitel on these tasks for the report filed on August 30, 2022 as Exhibit 24.  In 2023, after the report had been filed, Dr. Teitel spent an additional 2.2 hours on medical literature and 1.1 hours on drafting.  Across the two invoices, Dr. Teitel spent 25.6 hours reviewing Mr. Pisani's medical records and 6.2 hours writing and responding to emails.  Exhibit 48 at 57, 62-63.

Just as Ms. Toale's fees were reduced for her work on this report, so too are Dr. Teitel's.  As discussed, Dr. Teitel submitted a draft report to Ms. Toale on July 30, 2022.  Whatever Dr. Teitel produced apparently required approximately 30

hours of work from Ms. Toale to improve.  In any event, despite the combined efforts from Ms. Toale and Dr. Teitel, the expert report was not particularly helpful to petitioner. When experts fail to produce a report of good quality, special masters may reduce an award.  See Frantz, 146 Fed. at 146 (2019); Murray, 2023 WL 9503422, at *2-3.

Additionally, fees may be reduced for vagueness and inefficiency.  See, e.g., Lewis v. Sec'y of Health & Hum. Servs., 149 Fed. Cl. 308, 317 (2020) (special master did not abuse discretion in reducing fees for lack of specificity in billing narrative); see also id. at 321 ("A special master has discretion to reduce the number of hours an expert is awarded due to inefficiencies").  Dr. Teitel was reportedly difficult to get into contact with, and he kept vague invoices with often undated entries such as "E mail," "literature review," "report writing," and "chart review."  Exhibit 48 at 63; see also Tr. at 8 (Ms. Toale stating that Dr. Teitel "has some of the worst billing of any expert that I've ever used").

For these reasons, Dr. Teitel's fees are reduced by one-third, resulting in a deduction of $4,858.18.  Petitioner is thus awarded $9,716.36 for Dr. Teitel's work.

A reasonable amount of attorneys' costs is $15,899.59.[19]

## IV.    Conclusion

The Vaccine Act permits an award of reasonable attorney's fees and costs. 42 U.S.C. § 300aa-15(e). Accordingly, the undersigned awards **$145,239.29**, representing **$**129,339.70 in attorneys' fees and $15,899.59 in costs.[20]  This amount shall be paid through an ACH deposit to petitioner's counsel's IOLTA account for prompt disbursement.  In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the court is directed to enter judgment herewith.[21]

---

[19] $22,007.77 (requested costs) - $1,250 (reduction for Guidepoint Global) - $4,858.18 (reduction of one-third for Dr. Teitel's work on report and poor invoicing) = $15,899.59.

[20] $159,225.47 (total requested) - $4,242 (reduction of Ms. Toale's hourly rate for work on report) - $3,636 (reduction of one-third for Ms. Toale's work on report) – $1,250 (reduction for Guidepoint Global) - $4,858.18 (reduction of one-third for Dr. Teitel's work on report) = $145,239.29.

[21] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment by filing a joint notice renouncing their right to seek review.

**IT IS SO ORDERED**.

s/Christian J. Moran
Christian J. Moran
Special Master